**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-14318-CV-MARTINEZ/MAYNARD**

**PATRICK WILLIAMSON,**

      **Plaintiff,**

**v.**

**INDIAN RIVER MEMORIAL HOSPITAL, INC.**
**d/b/a Cleveland Clinic Indian River Hospital,**

      **Defendant.**
_____/

**OMNIBUS REPORT AND RECOMMENDATIONS**
**ON REFERRED MOTIONS**

This lawsuit is brought by an honorably discharged veteran against a hospital.  The veteran, Plaintiff Patrick Williamson ("Williamson"), claims that the hospital failed to lawfully accommodate his PTSD disability by not allowing his trained German shepherd, Gracie, into its facility during his hospitalization there in January 2019.  The hospital, Defendant Indian River Memorial Hospital, Inc. d/b/a Cleveland Clinic Indian River Hospital ("CCIRH"), denies all liability and counters that Plaintiff neither requested nor ever made the hospital aware of Gracie during the relevant timeframe.

Both parties have filed motions for summary judgment.  In moving for partial summary judgment, Williamson seeks a ruling as a matter of law that Gracie is a service animal that poses no direct threat.  DE 64.  Meanwhile, in its motion for summary judgment, CCIRH seeks full summary judgment on all counts and argues that the undisputed evidence shows that CCIRH did not have a discriminatory policy or practice in place during Williamson's January 2019 treatment; Williamson never triggered the existing non-discriminatory policy or otherwise requested an

accommodation from CCIRH; Williamson was not denied any services or accommodations; Gracie did not qualify as a service animal;  and Williamson fails to establish that he is entitled to any relief against CCIRH.  DE 68.

Both parties have also moved to strike affidavits filed in support of the opposing party's summary judgment motions.  Williamson seeks to strike the declaration of designated corporate representative, Anne Posey.  DE 80.  CCIRH, meanwhile, seeks to strike portions of the affidavits of Williamson, Leah Cady (long-time friend of Williamson), and Racheal Kirby (wife of deceased veteran who previously owned Gracie).  DE 104.

Lastly, CCIRH has filed a motion to exclude Williamson's proposed expert, Michelle Dunlap (owner and lead dog trainer at Service Dogs for Patriots), from testifying at trial or otherwise providing any expert opinions in this matter.  DE 67.

Presiding U.S. District Judge Jose E. Martinez has referred the above five motions to me for appropriate disposition.  DE 93.  Given the intertwined nature of the motions, I find it best to address them all together in this single omnibus report.  In doing so, I have carefully considered the record, all relevant filings, and the evidence of record.

## **PROCEDURAL HISTORY**

On August 6, 2021, Williamson began this lawsuit by filing a Complaint demanding a jury trial and alleging three counts for disability discrimination under Title III of the Americans with Disability Act ("ADA"),   Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and Section 1557 of the Patient Protection and Affordable Care Act ("ACA").  DE 1.  The Complaint centers on allegations that CCIRH discriminated against Williamson based upon his PTSD disability by not allowing his dog and qualified service animal, Gracie, to accompany or visit him during his January 2019 hospitalization and by not transferring him to a different facility where he

could be treated with a service animal.  On September 13, 2021, CCIRH filed its Answer and affirmative defenses.  DE 8.

On August 8, 2022, Williamson filed his Motion for Partial Summary Judgment.  That same day, CCIRH filed its Motion for Summary Judgment and Motion to Exclude Williamson's Proposed Expert, Michelle Dunlap.  Subsequently, on August 30, 2022, Williamson filed a Motion to Strike the Affidavit of Corporate Representative Anne Posey, which was filed in support of CCIRH's Motion for Summary Judgment.  Then, on October 5, 2022, CCIRH filed a Motion to Strike Portions of Three Affidavits submitted by Williamson.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The following facts draw principally from the parties' Joint Statement of Undisputed Facts, DE 65, as well as from undisputed portions of the parties' respective factual statements filed in support of and in opposition to the pending motions for summary judgment, along with the pertinent evidence of record.  DE 66, DE 77, DE 78, DE 89, DE 124-1.

Williamson is an honorably discharged Army veteran who has been diagnosed with service-related PTSD, which under most circumstances is considered a disability under the ADA. DE 65 ¶ 1; DE 66-2; DE 66 ¶¶ 1-2; DE 78 ¶¶ 1-2.  CCIRH, located in Vero Beach, Florida, is a place of public accommodation under 42 U.S.C. § 12181(7)(F), and is subject to the mandates of the ADA and its implementing regulations.  DE 65 ¶ 2.  CCIRH accepts Medicaid and Medicare, and is thus, a recipient of federal financial assistance subject to the requirements of Section 504. *Id.* ¶ 3.  CCIRH is principally engaged in the business of providing health care and is covered by Section 1557 of the ACA.  *Id.* ¶ 4.

On Thursday, January 17, 2019, Williamson was exhibiting suicidal ideations and his friends asked to come to his house to speak to him while also ensuring his safety.  DE 66 ¶ 11; DE

78 ¶ 11.  That same evening, law enforcement transported Williamson to CCIRH's Emergency Department ("ED") for an involuntary Baker Act examination.  DE 65 ¶ 5; DE 77 ¶ 20; DE 124-1 ¶ 20.  Williamson was not accompanied by and did not arrive at the ED with any animal.  DE 65 ¶ 6.  Upon examining Williamson, ED personnel determined that he was eligible for admission to the Behavioral Health Center ("BHC").  *Id.* ¶ 7.  As part of the hospital, CCIRH's BHC is a 46-bed facility located across the street that provides inpatient services for children, adolescents, adults, and seniors.  DE 77 ¶¶ 5, 8; DE 124-1 ¶¶ 5, 7, 8.  The BHC's interdisciplinary therapeutic team includes board certified psychiatrists, experienced RNs, licensed social workers and mental health technicians.  DE 77 ¶ 9; DE 124-1 ¶ 9.

Upon being medically cleared at the ED, Williamson was transferred from the ED to the BHC the evening of January 17, 2019.  DE 65 ¶ 8; DE 124-1 ¶ 23.  Williamson was not accompanied by and did not arrive at the BHC with any animal.  DE 65 ¶ 9.  Williamson received treatment at the BHC from Thursday, January 17, 2019 through the following Wednesday, January 23, 2019.  *Id.* ¶ 10.

Williamson inherited Gracie around May or June 2018 and he has owned her since then. DE 66 ¶ 10; DE 78 ¶ 7, 10.  While with her prior owner, Gracie received a certificate from Baden K9 Incorporated stating it "[h]ereby certifies Gracie, a female German Shepherd[] dog, Belonging to Daniel G. Kirby, As a Service K-9. The designated number is 01-01152017. Please accommodate both handler and K-9."  DE 66 ¶ 7; DE 78 ¶ 7; DE 126-22 at 36.

Williamson receives ongoing treatment from a local Veterans Affairs Medical Center ("VA") and Gracie has accompanied him to the VA on at least three occasions for treatment.  DE 66 ¶ 3; DE 78 ¶ 3; DE 66-14.

## MOTIONS TO STRIKE

Both parties move to strike affidavit evidence filed by the opposing party in connection with the summary judgment briefing.  An affidavit or declaration may be used to support or oppose a motion for summary judgment.  Fed. R. Civ. P. 56(c)(1)(A).  The affidavit or declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

Both parties have invoked the sham affidavit rule.  Under this rule, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  A court may strike an affidavit as a sham when the affidavit flatly contradicts the affiant's previous testimony "for the transparent purpose of creating a genuine issue of fact where none existed previously." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1306 (11th Cir. 2016).  However, "the rule only operates in a limited manner to exclude unexplained discrepancies and inconsistencies, as opposed to those which create an issue of credibility or go to the weight of the evidence." *Id.* (quotations omitted).  Importantly, courts apply the rule sparingly "because of the harsh effect it may have on a party's case." *Allen v. Bd. of Pub. Educ. for Bibb Co.*, 495 F.3d 1306, 1316 (11th Cir. 2007) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987)).

With the above general legal principles in mind, I will consider each party's motion to strike in turn.

I.      **Williamson's Motion to Strike Anne Posey's Declaration – DE 80**

Williamson seeks to strike the affidavit of CCIRH's designated corporate representative, Anne Posey.  Williamson argues that Ms. Posey's "self-serving" declaration is a "sham affidavit" that should be stricken because it "is inconsistent with her prior testimony in critical ways" and "contradicts the testimony of other deponents."  DE 80 at 1-2.  Williamson argues also that the declaration should be stricken because it is filled with technical inaccuracies.  *Id.* at 5-7.

Ms. Posey is CCIRH's designated corporate representative.  A declaration submitted by a corporate representative in support of summary judgment is properly considered when the representative expressly verifies that the matters stated therein are based on his or her own personal knowledge gained through review of business records.  *See Atlantic Marine Fla., LLC v. Evanston Ins. Co.,* 2010 WL 1930977 (M.D. Fla. May 13, 2010) (denying motion to strike the declaration of a corporate representative and holding that the corporate representative's review of business records established the "personal knowledge" required); *Int'l Fid. Ins. Co. v. Kerri A. Noyes Constr., Inc.*, 2018 WL 11419655 (S.D. Fla. Apr. 17, 2018) (denying plaintiff's motion to strike an affidavit because corporate representative affiant reviewed the relevant records); *Sunbelt Worksite Mktg., Inc. v. Metro. Life Ins. Co.*, 2011 WL 3444256 (M.D. Fla. Aug. 8, 2011) (denying plaintiff's motion to strike an affidavit in support of defendant's summary judgment because as a Rule 30(b)(6) designee it is not necessary for a corporate representative to have personal knowledge of every fact).  Such is the case here.

Ms. Posey's sworn declaration states that she has worked for CCIRH since 2017 and she was the BHC's Administrative Director when Williamson was treated there in January 2019.  DE 126-2 ¶ 3.  As Administrative Director, she oversaw the BHC and was responsible for its general operations.  DE 66-12, Posey Deposition, 16:22-17:7.  In her declaration, Ms. Posey avers that she

is familiar with and has personal knowledge of the mission, vision, and priorities of the BHC and CCIRH.  DE 126-2 at ¶¶ 7, 14.  Ms. Posey further avers that she is familiar with and has reviewed CCIRH's policies and procedures, including those relating to service animals.  *Id*. at ¶¶ 18, 40. Many of these written policies and procedures are attached to her declaration as exhibits.  Ms. Posey further asserts familiarity with Williamson's treatment at CCIRH based upon her review of available CCIRH medical records relating to his treatment there on January 17-23, 2019.  *Id*. at ¶ 22.  Overall, Ms. Posey's declaration properly verifies that she had access to and reviewed the pertinent business records of the BHC and CCIRH as they pertain to the information contained in her affidavit.

Williamson argues that portions of Ms. Posey's declaration should be stricken as hearsay. While inadmissible hearsay generally cannot be considered on a motion for summary judgment, a court may consider hearsay statements pertaining to a motion for summary judgment if the statement could be "reduced to admissible evidence at trial." *Macuba v. Deboer,* 193 F.3d 1316, 1322 (11th Cir. 1999).  Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  There are exceptions to this rule, such as Rule 803(6)'s business records exception.  I find that the CCIRH business records and policies relied upon by Ms. Posey in her affidavit could likely be reduced to admissible evidence at trial in the form of a business record.  *See Saunders v. Emory Healthcare, Inc.,* 360 Fed. Appx. 110, 112 (11th Cir. 2010) (affirming denial of motion to strike declaration because the documents attached to the declaration are either non-hearsay or could be reduced to admissible form).  Thus, because the attached documents could be reduced to admissible evidence at trial, her declaration should not be stricken on this basis.

Williamson argues next that Ms. Posey's declaration should be stricken because it conflicts with her sworn deposition testimony and other witness testimony. I disagree. On May 6, 2022, Ms. Posey appeared for a deposition where she responded at length to questions as CCIRH's authorized corporate representative. DE 66-12. During her deposition, Ms. Posey testified that she had no direct knowledge about any request by Williamson for Gracie to accompany Williamson during his stay at the BHC and made clear that this lack of knowledge was based on her review of available records. *See, e.g.*, DE 66-12 at 124:9-25 ("I have no knowledge that there was any request" based upon an investigation that included Ms. Posey's "review [of] the clinical record or medical record"); 126:1-5 ("I reviewed the clinical record and saw no evidence in the clinical record that a service animal was ever mentioned"); 128:8-22 (when asked if CCIRH knew of anyone who may have spoken to Bruce Cady about a request to have Gracie visit, Ms. Posey responded: "I did not see that documented in the medical record").

Contrary to Williamson's assertions, Ms. Posey's declaration does not flatly contradict her prior deposition testimony. Ms. Posey's declaration makes clear that it is based on her review of pertinent records and policy, which coincides with her prior deposition testimony. Moreover, Williamson's argument to strike based upon alleged contradictions between Ms. Posey's declaration and the testimony of *other* deponents is a non-starter under clear legal authority. *See Van T. Jurkins & Assocs., Inc.*, 736 F.2d at 657 ("[w]hen *a party* has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, *that party* cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.") (emphasis added); *McCall v. Houston Co.*, 2014 WL 3045552, at *3, n.8 (M.D. Ala. Jul. 3, 2014) ("[W]hile the court may reject a witness's

affidavit if it directly contradicts *that same* witness's prior deposition testimony…the same is not true of the affidavit that merely contradicts *another* witness's deposition.").

Lastly, Williamson claims Ms. Posey's declaration should be stricken because it is "filled with inaccuracies" including "mislabeled and missing exhibits."   DE 80 at 5-7.   Williamson specifically points to paragraphs 42-53 of the declaration.   However, upon review of the challenged paragraphs and their referenced exhibits, I find no valid reason to strike Ms. Posey's declaration on this basis.   The challenged paragraphs are contained within a section of the affidavit describing CCIRH's "other policies and procedures" and each paragraph merely identifies an attached CCIRH policy, procedure, or record—including but not limited to general policies about patient rights, patient assessments, voluntary admissions, discharge procedures, and resolution of patient complaints, grievances, or concerns.   *See, e.g.* DE 126-6 (Exhibit S, CCIRH's "Adult Inpatient Handbook"); DE 126-7 (Exhibit T, CCIRH policy on "Group Documentation"); DE 126-8 (Exhibit U, CCIRH policy on "Assessment, Level of Care").   The attached policies speak for themselves and largely coincide with Ms. Posey's general descriptions.   Based upon my review, discrepancies in policy numbering or other scrivener's errors are minor and do not constitute valid grounds for striking Ms. Posey's affidavit.[1]   Accordingly, based on the foregoing, I find no merit in Williamson's Motion to Strike Ms. Posey's Affidavit and recommend that it be **DENIED**.

## II.     CCIRH's Motion to Strike Portions of Three Affidavits – DE 104

CCIRH seeks to strike portions of three affidavits submitted by Williamson based upon an alleged failure to comply with Rule 56(c)(4) in that they "primarily consist of inadmissible hearsay

---

[1] Going forward in this case, I strongly encourage CCIRH and its counsel to carefully review policy documentation to make sure that any reference to policy numbering and other identifiers are consistent to avoid confusion.   The discrepancies in Ms. Posey's affidavit regarding the attached general policies mostly have to do with policy numbering and are thus minor but it is best practice to avoid avoidable errors through careful review and cross-reference.

and statements that are not based on the affiant's personal knowledge, but rather, are based on conjecture and speculation." DE 104 at 2. Invoking the sham affidavit rule, CCIRH argues also that two of the challenged affidavits conflict with prior deposition testimony and "constitute nothing more than a sham attempt to create an issue of fact and defeat Defendant's Motion for Summary Judgment." *Id.*

The first challenged affidavit is from Williamson himself. It is four pages long, was notarized on August 8, 2022, and states that it contains facts for which Williamson has "personal knowledge." DE 66-5. It generally contains information about how Williamson came to own Gracie, information about Gracie's prior veteran owner and training, Williamson's interactions with Gracie, and information about Williamson's treatment at CCIRH. *Id.* Williamson was previously deposed in this case on May 26, 2022. DE 126-18.

The second challenged affidavit is from Leah Cady—Williamson's long-time friend. It is three pages long, was notarized on November 1, 2022,[2] and states that it contains "true and accurate" facts for which Ms. Cady has "personal knowledge." DE 133-1. It generally contains information about Ms. Cady's observations of Williamson with Gracie and information about Ms. Cady's care of Gracie while Williamson was being treated at CCIRH, including her one visit to the BHC with Gracie while Williamson was there. *Id.* Ms. Cady was previously deposed in this case on May 26, 2022. DE 77-6.

The third and final challenged affidavit is from Racheal Kirby—the widow of Gracie's prior veteran owner. It is three pages long, was notarized on August 25, 2022, and states that it

---

[2] Ms. Cady's original affidavit was notarized on August 4, 2022. DE 66-9. A corrected affidavit was notarized and filed on November 1, 2022. DE 133-1. For purposes of this report, I have reviewed and considered Ms. Cady's corrected affidavit and its contents.

contains facts for which Ms. Kirby has "personal knowledge." DE 75-2. It generally contains information about Ms. Kirby's deceased veteran husband, how her husband came to own Gracie, how her husband knew Williamson, and the decision for Gracie to be given to Williamson following her husband's death. *Id.* Ms. Kirby has not been deposed in this case.

Mindful of Rule 56's requirements, I have reviewed all three affidavits and the deposition testimony of Williamson and Ms. Cady. Based on this review, I find no justification to strike any of the three affidavits under the sparingly-applied sham affidavit rule or otherwise. For instance, regarding CCIRH's objections to Williamson's affidavit based on alleged inconsistencies with his prior deposition testimony, a court need not strike every "minor discrepancy contained in an affidavit[.]" *Tippens v. Celotex, Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). Rather, the affidavit must "directly contradict[]" earlier testimony. *Van T. Junkins & Assoc., Inc. v. U.S. Indus, Inc.*, 736 F.2d 656, 657–58 (11th Cir. 1984).

At most, any discrepancies between Williamson's affidavit and his earlier deposition testimony do not rise to the level of direct contradiction. CCIRH argues that Williamson's affidavit includes information about Gracie's prior owner and training whereas his deposition testimony suggests that he has no personal knowledge about either topic. This is simply untrue. The deposition excerpts cited by CCIRH are taken out of context. Read in proper context, during his deposition, Williamson testified that Gracie's prior owner, Daniel Kirby, was Williamson's staff sergeant in the Army; the two of them served overseas together; and they kept in regular contact up until Mr. Kirby passed away. DE 126-18 at 49:2-25; 51:20-24. Williamson also testified about what he knew concerning Gracie's prior training with Baden K9 and that he knew about such training based on existing records and conversations with others, including a phone conversation with a Baden K9 representative to inquire about an undated Baden K9 certificate certifying Gracie

as a "Service K-9" for Mr. Kirby. *Id.* at 51:9-52:2; 53:16-54:12; 59:1-22; 61:1-4; DE 126-22 at 36. Part of Williamson's testimony, highlighted by CCIRH, included statements that he never physically saw Gracie working for Mr. Kirby or took Gracie back to Baden K9 for additional training. DE 126-18 at 50:5-9, 68:17-22. Williamson's testimony about never seeing Gracie work directly for Mr. Kirby or taking her back to Baden K9 for training is consistent with Williamson's affidavit statements on these topics.

CCIRH also objects to parts of Williamson's affidavit as hearsay. However, all the objected-to statements can be presented in admissible form at trial. *See Macuba*, 193 F.3d at 1324. For example, one challenged statement is: "Being Baker Acted and separated from Gracie was devastating for me, and my Baker Act commitment was shared with the local veterans community who was also saddened to see me and Gracie treated this way by Cleveland Clinic." DE 66-5 ¶ 20. CCIRH can inquire further of Williamson or Cady at trial about this statement, which would be evidence in an admissible form, which is all that is required at this stage. The same is true of other challenged statements contained within Williamson's affidavit. *See generally McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996), *aff'd sub nom. McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781 (1997) (acknowledging that courts may consider "otherwise admissible evidence to be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form").

CCIRH objects to portions of Williamson's affidavit as either conclusory or an attempt to "contradict, recast, and spin" previously undisputed facts. I disagree. Williamson's affidavit statements about his experiences at CCIRH are based on his own personal knowledge and are supported by his own prior testimony and other evidence in the record. Williamson's January

2019 treatment at CCIRH and information about Gracie are at the very heart of this case. Williamson's affidavit properly speaks to these issues and there is no reason to strike it.

As for Ms. Cady, CCIRH argues that portions of her affidavit contradict her prior testimony. For example, CCIRH asserts that Ms. Cady's affidavit describes an incident where she brought Gracie into the BHC lobby to visit Williamson but that CCIRH would not allow Gracie in whereas her testimony indicated that she did not talk with anyone employed by CCIRH about Gracie. However, these statements are not inherently inconsistent. At her deposition, Ms. Cady testified that she and her husband brought Gracie inside the BHC lobby with the intention of all three of them visiting with Williamson but that her husband, Bruce Cady, asked Ms. Cady to wait outside with Gracie after telling her that Gracie wouldn't be allowed in by CCIRH. DE 77-6 at 78:1-23. Ms. Cady consistently testified that her knowledge about Gracie not being allowed in to visit Williamson came from her husband and Williamson. *Id.* at 76:3-6; 79:4-80:1. Ms. Cady's testimony does not flatly contradict her affidavit statements that she went with her husband to visit Williamson, brought Gracie in to the BHC lobby, and was told by her husband that Gracie could not come in which led her to return to the car with Gracie while her husband visited with Williamson. DE 133-1. Ms. Cady's affidavit should not be stricken.

Finally, as to Ms. Kirby's affidavit,[3] CCIRH seeks to strike four of seven total paragraphs based on alleged "statements not based on personal knowledge as well as suggestions or implications which are not based on personal knowledge or fact and are unduly prejudicial." DE 104 at 16-17. Upon review, I cannot agree. On their face, Ms. Kirby's statements plainly involve

---

[3] CCIRH takes issue with the fact that the affidavits of Mr. Williamson and Ms. Kirby do not include a statement that the facts contained therein "are true and correct." I am not persuaded. Both affidavits are notarized, provided under oath, and include a statement that the asserted facts are made on "personal knowledge" of each respective affiant. This is sufficient.

her personal actions, observations, and involvement related to her deceased husband's receipt of Gracie as part of a community fundraising effort, Gracie's training with Baden K9 "for use by my husband with PTSD," and the decision to rehome Gracie with Williamson following her husband's death. DE 75-2. I see no reason to strike this affidavit.

As for the remainder of CCIRH's objections not specifically addressed, I reviewed each and determined all are without merit. Accordingly, I recommend that CCIRH's Motion to Strike Portions of Three Affidavits be **DENIED**.

### <u>MOTION TO EXCLUDE EXPERT TESTIMONY</u>

CCIRH has filed a Motion to exclude Williamson's proposed expert, Michelle Dunlap, M. Ed., from testifying or otherwise providing any expert opinions at trial. As grounds, CCIRH asserts that Ms. Dunlap is not qualified to testify as an expert on the sufficiency of Gracie's qualification as a service animal; her opinion is based on insufficient facts or data rather than reliable methods applied to the facts of this case; and her opinion will not assist the jury in this case. DE 67 at 5-8.

In federal court, expert opinions must meet the admissibility guidelines set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702. Under Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)    the testimony is based on sufficient facts or data;
> (c)    the testimony is the product of reliable principles and methods; and
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 requires district courts to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  Before permitting expert opinion testimony, a court must make certain that the expert employs "in the courtroom the same level of intellectual rigor that characterizes the practice of the expert in the field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Courts must act as gatekeeper to prevent speculative and unreliable expert testimony from reaching the jury.  *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (the "task of evaluating the reliability of expert testimony is uniquely entrusted to the district court under *Daubert*").  This gatekeeping role is "significant" because an "expert's opinion 'can be both powerful and quite misleading.'" *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 595).

As gatekeeper, the Eleventh Circuit requires district courts to conduct a three-part inquiry: (1) first, the expert must be qualified to testify competently regarding the matters that he or she intends to address; (2) second, the methodology by which the expert reaches his or her conclusions must be sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) third, the testimony must assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562–63 (11th Cir. 1998); *see also Cooper v. Marten Transp., Ltd.*, 539 F. App'x 963, 965–67 (11th Cir. 2013).  The party offering the expert opinion testimony bears the burden to establish, by a preponderance of the evidence, these three prongs pertaining to an expert's qualification, reliability, and helpfulness. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010); *Sumner v. Biomet, Inc.*, 434 F. App'x 834, 841 (11th Cir.2011); Frazier, 387 F.3d at 1260.

While admissibility rulings under *Daubert* inherently require the court to conduct an exacting analysis of the proffered expert's methodology, it is not the court's role to make ultimate conclusions as to the persuasiveness of the proffered evidence. *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003); *see also* Fed. R. Evid. 702, Advisory Committee Notes—2000 Amendment ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule"). The gatekeeper role is not intended to supplant the adversary system or the role of the jury. *Quiet Tech.*, 326 F.3d at 1341; "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also U.S. v. Ala. Power Co.*, 730 F.3d 1278, 1282–85 (11th Cir. 2013) (the *Daubert* inquiry "is not intended to supplant" cross-examination and presentation of contrary evidence).

Here, Williamson relies upon Ms. Dunlap as a professional dog training expert. Ms. Dunlap authored a written report, dated March 14, 2022, in which she sets forth her qualifications and background experience and her personal observations of Gracie alongside Williamson during two Zoom sessions and an in-person evaluation in three public settings during approximately three hours. DE 67. Among other things, Ms. Dunlap's report explains various "task-trained behaviors" employed by trained dogs to assist their handlers with PTSD—including blocking, distracting/redirecting and grounding—and she provides examples of Gracie exhibiting these behaviors alongside Williamson during her in-person observation on February 28, 2022. *Id.* After explaining her methodology and reasoning with citation to applicable facts and data, Ms. Dunlap makes the key conclusions that "Gracie is not a direct threat to people or dogs;" "Gracie is a trained, working service dog, providing [specified] task-trained behaviors to assist Mr. Williamson in

treating his medical condition, PTSD;" and that Williamson "should have been allowed to have his service dog, Gracie, with him at all times when hospitalized" and in the ED.  *Id.* at 17-21.  Ms. Dunlap was deposed on May 25, 2022.  DE 66-4.

Here, upon consideration of Ms. Dunlap's report and deposition testimony, I find that she qualifies to testify competently regarding certain matters in this case.  First, Ms. Dunlap has specialized knowledge of training service dogs and, in particular, she has previously trained service dogs for veterans like Williamson with PTSD.   As stated in her resume, Ms. Dunlap has over 20 years of professional dog training experience and has specialized experience in dog behavior analysis, behavior modification of aggressive dogs, and service dog training.  *Id.* at 23-24.  She currently works as the Executive Director and Lead Trainer at Service Dogs for Patriots, described as a non-profit organization founded by Ms. Dunlap that is designed to train dogs to become PTSD service dogs for veterans.  DE 67 at 1.  Since this organization's founding in 2017, Ms. Dunlap has trained 30 psychiatric service dogs for veterans with PTSD.  *Id.* at 24.  Ms. Dunlap also owns and works as a lead trainer at Gainesville Canine Academy, described as a private dog training company that provides expert dog training services including therapy dog training and service dog training.  *Id.* at 23.  Through this academy, she has trained over 75 psychiatric service dogs.  *Id.* Ms. Dunlap has Bachelor and Master degrees in the field of Education and she has attended training workshops and conferences focusing on a wide array of dog behavior.  *Id*.  Ultimately, I find that Ms. Dunlap's experience in the relevant field of professional dog training qualifies her to testify about certain matters in this case.  *See Frazier*, 387 F.3d at 1260-61 (the plain language of Rule 702 makes clear, "[w]hile scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status").

Second, I find that Ms. Dunlap's testimony is based on sufficient facts and data for certain conclusions she makes.  Expert testimony is admissible only if "the testimony is based on sufficient facts or data; ... the testimony is the product of reliable principles and methods; and ... the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  A witness "relying solely or primarily on experience ... must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Frazier*, 387 F.3d 1244 at 1261.

Here, as explained in her report, Ms. Dunlap reaches conclusions about Gracie's behavior and demeanor based on her comprehensive evaluation of Gracie performing various tasks alongside Williamson.  These observations included two virtual Zoom sessions and her in-person observations of Gracie at three public settings in the community on February 28, 2022.  Ms. Dunlap observed Gracie performing tasks consistent with Ms. Dunlap's knowledge and experience of tasks performed by other trained service dogs.  Ms. Dunlap has significant dog training experience—in particular, she knows and has trained dogs for use by individuals with PTSD—and has observed trained dogs in action with their handlers.  Ms. Dunlap adequately ties her experience to her observations of Gracie interacting with Williamson thereby shoring up a reliable foundation for her testimony and opinions about how and why Gracie exhibits the features of a professionally trained animal as well as the fact that Gracie poses no direct threat to other people or dogs.  *Id.* (an expert can base her testimony on her experience, in which case the expert must explain "why that experience is a sufficient basis for the opinion").

Although I find that Ms. Dunlap is qualified to testify and has employed reliable methodology, these findings apply to her testimony regarding professional dog training generally

and her opinions that, as of the time Ms. Dunlap observed Gracie, "Gracie is a trained, working service dog, providing [specified] task-trained behaviors to assist Mr. Williamson in treating his medical condition, PTSD" and that "Gracie is a well-behaved, well-trained psychiatric service dog, calm in demeanor, who poses no direct threat to dogs or people."  DE 67 at 17, 21.   She should thus not be excluded entirely.

However, there are certain aspects of her testimony which do not survive Rule 702's exacting requirements and could lead to potential jury confusion.  Most notably, Ms. Dunlap's conclusion that Williamson "should have been allowed to have his service dog, Gracie, with him at all times when hospitalized" at CCIRH is without sufficient foundation.  DE 67 at 20.  To support her conclusion that Williamson should have been allowed to have Gracie with him in the BHC, Ms. Dunlap relies upon her knowledge about other veteran graduates of her other training programs who had been hospitalized and benefitted from having their trained dogs with them to rest better.  *Id.*  However, Ms. Dunlap admittedly has no similar knowledge or experience with either Williamson or Gracie before she first met them in February 2022 (which is over three years after Williamson's January 2019 treatment) thus leaving simply too great of an analytical gap between what she knows and her proffered opinion.  *See generally Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("conclusions and methodology are not entirely distinct from one another.... [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert"); *Hendrix ex rel. G.P. v. Evenflo Co., Inc.,* 609 F.3d 1183, 1194 (11th Cir. 2010) ("the trial court is free to 'conclude that there is simply too great an analytical gap between the data and the opinion proffered'") (quoting *Joiner*, 522 U.S. at 146)).

Ultimately, based on the foregoing, I find that Williamson has not carried his burden to show that Ms. Dunlap's testimony tied to his January 2019 treatment at CCIRH—including her opinions about whether Williamson would have benefitted from having Gracie with him during his at-issue hospitalization or whether Gracie should have been allowed in to the BHC as a service animal or otherwise—is based on reliable methodology.  This testimony should be excluded as unreliable.  In addition, portions of Ms. Dunlap testimony are unhelpful and would improperly invade the province of the jury by impermissibly suggesting to the jury what results should be reached under applicable legal regulations.  For example, in her report, Ms. Dunlap refers to the ADA website's definition of a service animal before concluding that "Mr. Williamson and his dog Gracie should be afforded all protections of the [ADA]."  DE 67 at 20-21.  While "[a]n expert may testify as to [her] opinion on an ultimate issue of fact[,] ... [a]n expert may not ... merely tell the jury what result to reach." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990).  Similarly, an expert "may not testify to the legal implications of conduct; the court must be the jury's only source of law."  *Id.*   Any testimony by Ms. Dunlap explaining the ADA regulatory scheme for service animals falls into this category of unhelpful testimony and must also be excluded.

Accordingly, I recommend that CCIRH's Motion to Exclude Proposed Expert, Michelle Dunlap, be **GRANTED IN PART AND DENIED IN PART**.  While I find that Ms. Dunlap's testimony should not be entirely excluded, I find good reason to set boundaries on her testimony at this stage.  Specifically, I recommend that she be permitted to offer testimony about her general knowledge of professional dog training for dogs servicing individuals with diagnosed PTSD; her personal observations of Williamson and Gracie; and her opinion about how and why she believes Gracie exhibits the general behavioral characteristics of a professionally trained animal during

these observations based upon her own experience.  Of course, any such testimony will be the subject of appropriate cross-examination.  I further recommend that Ms. Dunlap not be allowed to testify about anything tied to Williamson's hospitalization in January 2019, including whether Gracie should have been allowed in to the BHC, or anything to do with the ADA's legal scheme for service animals.  I recommend that these testimonial boundaries for Ms. Dunlap be subject to revisiting upon appropriate motion or objections by either party when and if the specific nature of her trial testimony can be reevaluated within the context of trial.

## MOTIONS FOR SUMMARY JUDGMENT

Having reached the above recommended disposition of the motions to strike and exclude, I now turn to the parties' cross-motions for summary judgment.

### I.     Summary Judgment Standard of Review

Summary judgment is properly granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A dispute is genuine if a "reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee Tribe of Indians of Fla. v. U.S.*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247-48).  A fact is material if "it would affect the outcome of the suit under the governing law."  *Id.* (citing *Anderson*, 477 U.S. at 247-48); *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005).

In deciding a summary judgment motion, the Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See*

*Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016); *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). The Court does not weigh conflicting evidence or make credibility determinations. *Furcron*, 843 F.3d at 1304; *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007). If a genuine dispute of material fact exists, the Court must deny summary judgment. *Skop*, 485 F.3d at 1140.

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. 'Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.' Thus, a court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Torres v. Rock & River Food Inc.*, 244 F. Supp. 3d 1320, 1327–28 (S.D. Fla. 2016) (citations omitted).

When a motion for summary judgment is presented to the court, it opens the entire record for consideration, and the Court may enter judgment in favor of the nonmoving party on any grounds apparent in the record, even where there is no formal cross motion. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1204 (11th Cir. 1999).

## II.    Williamson's Motion for Partial Summary Judgment - DE 64

In moving for partial summary judgment, Williamson seeks a ruling as a matter of law that Gracie is a service animal that poses no direct threat. DE 64. CCIRH counters that Williamson's motion is based on immaterial, unsupported facts and evidence related to issues "which are of no legal consequence to this action." DE 79 at 5-6. Additionally, CCIRH maintains that, under governing regulations, Williamson must establish that Gracie qualified as a "service animal" by showing that Gracie was individually trained to do work or perform tasks for Williamson's benefit

at the time of his January 2019 treatment and that such tasks directly related to Williamson's disability. *Id.* at 7-8.

Title III of the ADA prohibits discrimination against individuals with disabilities in places of public accommodation, such as hospitals. *See* 42 U.S.C. §§ 12181(7)(F), 12182.  To implement this prohibition, Congress delegated authority to the Attorney General to promulgate regulations setting more specific standards of compliance with the ADA.  *See id.* § 12186(b). Title III does not explicitly address service animals, but given the important role played by service animals to individuals who need them, the Attorney General promulgated regulations requiring places of public accommodation to permit "[i]ndividuals with disabilities ... to be accompanied by their service animals in all areas ... where members of the public, program participants, clients, customers, patrons, or invitees, as relevant, are allowed to go." 28 C.F.R. § 36.302(c)(7).

Importantly, the regulations define a "service animal" as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." 28 C.F.R. § 36.104.  The regulation further provides the work or tasks performed by the dog "must be directly related to the individual's disability"—such as "helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors"—however "the provision of emotional support, well-being, comfort, or companionship do[es] not constitute work or tasks for the purposes of this definition." *Id.*

Generally, a "plaintiff alleging Title III ADA discrimination must initially prove that (1) he is a disabled individual; (2) the defendants own, lease, or operate a place of public accommodation; and (3) the defendants discriminated against the plaintiff within the meaning of

the ADA."[4] *Norkunas v. Seahorse NB, LLC*, 444 Fed. Appx. 412, 416 (11th Cir. 2011) (citing 42 U.S.C. § 12182(a)).  It is undisputed that Williamson's PTSD diagnosis is a disability under the ADA.  It is also undisputed that CCIRH is a place of "public accommodation" under the ADA. *See* 42 U.S.C. § 12181(7)(F) (defining "public accommodation" as, among other things, a "professional office of a health care provider, hospital, or other service establishment").  The parties' dispute centers on the third prong, which requires Williamson to prove that CCIRH discriminated against him within the meaning of the ADA by refusing to allow the presence of Gracie to accompany him while at CCIRH during his January 2019 treatment as an accommodation of Williamson's disability. *See* 28 C.F.R. § 36.302(c)(7). This, in turn, requires Williamson to prove Gracie is a "service animal" under 28 C.F.R. § 36.104.  *See, e.g.*, *Cordoves v. Miami-Dade County*, 92 F. Supp. 3d 1221, 1230 (S.D. Fla. 2015) (collecting cases).

Williamson seeks a ruling that Gracie is a service animal as a matter of law.  CCIRH argues that Williamson fails to set forth evidence establishing any genuine issue of fact regarding Gracie's status as a service animal during his January 2019 treatment period and instead relies on immaterial and inadmissible evidence from several years later.  CCIRH thus maintains that Williamson cannot prove that Gracie is a service animal as a matter of law.  I disagree with both parties on this point and find that genuine issues of fact exist concerning Gracie's status as a service animal during the relevant timeframe precluding summary judgment for either side on this significant issue.

---

[4] Williamson also brings his claims under Section 504 and the ACA.  In the Eleventh Circuit, with the exception of its federal funding requirement, Section 504 uses the same standards as the ADA, and, thus, cases interpreting either are applicable and interchangeable. *Badillo v. Thorpe*, 158 Fed. Appx. 208, 214 (11th Cir. 2005) (citing *Cash v. Smith*, 231 F.3d 1301, 1305 & n. 2 (11th Cir. 2000)); *Silva v. Baptist Health S. Fla., Inc*., 856 F.3d 824, 830 (11th Cir. 2017) ("ADA and RA [Section 504] claims are governed by the same substantive standard of liability."). 42 U.S.C. § 18116(a) extends the standards of Section 504 to the ACA.

Generally, courts deciding summary judgment motions on ADA claims have set a low bar to show a genuine issue of fact regarding a dog's status as a service animal. *Cordoves v. Miami-Dade County*, 92 F. Supp. 3d 1221, 1230–31 (S.D. Fla. 2015). Regarding training, it is not necessary to proffer documented evidence of training instead of only testimony and there is no need to show that a dog was trained by a "certified trainer." *Id.* at 1230 (citations omitted). Courts recognize that there are no federally-mandated training standards and a service dog may be individually trained at home—notably, "[t]here are no requirements as to the amount or type of training that a service animal must undergo, nor the type of work or assistance that a service animal must provide, but the animal be trained to perform tasks or do work for the benefit of a disabled individual." *Id.* (citations omitted). Instances where summary judgment has been granted to a defendant include cases where a plaintiff cannot show with any specificity a genuine issue of fact regarding an animal's training or status as a service animal under the ADA. *Id.* at 1230-31; *Baugher v. City of Ellensburg, WA*, 2007 WL 858627, at *5 (E.D. Wash. Mar. 19, 2007) (granting summary judgment to defendant on ADA claim brought by *pro se* plaintiff because "the record is devoid of any specific work or tasks that [plaintiff's dog Bun] was trained to perform for the benefit of [p]laintiff."); *Rose v. Springfield–Greene County. Health Dep't*, 668 F.Supp.2d 1206, 1214–15 (W.D. Mo. 2009) (finding evidence insufficient to establish that plaintiff's bonnet macaque monkey Richard was a service animal where plaintiff provided "no explanation as to the monkey's training or the specific cues that would trigger the monkey to perform these 'tasks,'" and monkey provided nothing more than comfort and encouragement, making it "equivalent to a household pet" and not a service animal); *Davis v. Ma*, 848 F. Supp. 2d 1105, 1114 (C.D. Cal. 2012) (granting summary judgment in favor of defendants where 13-week old puppy "only had some 'basic

obedience' training," and the plaintiff, who had a degenerative back disability, "was still attempting to train the puppy to assist him with walking and balancing").

Contrary to both parties' positions, I find that the proffered evidence in this case creates genuine disputes of material fact regarding Gracie's status as a service animal. It is undisputed that Williamson is a veteran with service-related PTSD. There is evidence to show that Williamson inherited Gracie in May or June of 2018—which was six to seven months prior to his January 2019 treatment—from another veteran who owned Gracie as a trained service dog to assist with that veteran's PTSD before he passed away in April 2018. DE 75-2 (Ms. Kirby's sworn affidavit explaining the circumstances of her husband's receipt of Gracie as a "trained PTSD Service Dog" and how Williamson came to inherit Gracie following her husband's death); DE 126-22 (Baden K-9 Certificate certifying Gracie as a "Service K-9" for her prior owner, Daniel Kirby). There is also evidence about Williamson's attempts to learn about Gracie's prior training upon receiving her and his individualized use of commands to acclimate Gracie to his own daily routine for his use as a service dog relating to his PTSD. DE 66-1 at 59:8-60:8, 71:22-73-5 (Williamson's deposition testimony about a conversation he had with Baden K9 about Gracie' prior training, his understanding that Gracie was already fully trained, and his attempts to acclimate Gracie to his daily routine and incorporation of proper training commands). There is also the expert report and deposition testimony of dog training expert Ms. Dunlap. DE 67, DE 66-4. As discussed above, I find certain portions of Ms. Dunlap's testimony admissible. Her admissible testimony constitutes evidence of Gracie exhibiting signs and behavior of a trained PTSD service dog who directly assisted Williamson *at the time Ms. Dunlap made her observations in 2022*.

On the other hand, Ms. Dunlap's testimony is not conclusive evidence of whether Gracie was "individually trained to do work or perform tasks" for Williamson's benefit *during his 2019*

*treatment* and whether and how any such tasks performed by Gracie "directly related to [Williamson's] disability" at that relevant time.  *See* 28 C.F.R. § 36.104.  For example, CCIRH points to the fact that Gracie's name is on a certificate as a certified service dog for another prior owner raising a genuinely disputed issue about the nature and extent of Gracie's training for Williamson at the time he was treated in 2019, which was roughly half a year after he first inherited Gracie.  While this certificate combined with Ms. Dunlap's admissible testimony may suggest Gracie's predisposition to do certain tasks for Williamson, there still remains factual questions about how much and what kind of individual training Gracie required to ensure that she adequately performed alleged service tasks for Williamson as opposed to her prior owner.  Testimony by Williamson and others about Williamson having trained Gracie himself after speaking with Baden K9 representatives who previously trained Gracie for her prior owner requires the weighing of evidence and credibility determinations which cannot be made as a matter of summary judgment.

Notably, Williamson cites to no binding authority granting summary judgment to a moving plaintiff like him on this issue.  On the contrary, Williamson cites *Cordoves* where a court denied summary judgment to a moving defendant after finding that a toy poodle's owner—the plaintiff in that case—"demonstrated a genuine dispute of fact regarding [the toy poodle's] status as a service animal."  *Cordoves*, 92 F.Supp.3d at 1231-32.  The defendant had asserted that there was no evidence to show that the toy poodle was specifically trained to perform tasks related to the owner's PTSD disorder.  *Id.*  The court found, however, contradictory evidence that the owner's daughter provided self-taught service-dog training after conducting online research and testimony regarding the dog's ability to alert her owner of an incoming panic attack.  *Id.*  As in *Cordoves*, the evidence here presents genuinely disputed factual issues regarding Gracie's status as a service

animal for Williamson at the relevant time he was treated at CCIRH that are properly considered by a factfinder at trial and not as a matter of summary judgment.

In all, there is evidence to show that Gracie may have in fact helped Williamson cope with his PTSD at the time of his January 2019 treatment and a jury could find that Gracie is a trained service animal who performs specific tasks relating to needs of an individual with PTSD and does more than just provide emotional support or comfort to her owner.  Quite unlike the dog in *Baugher*, the monkey in *Rose* and the puppy in *Davis*, there is evidence that Gracie was trained specifically to assist a handler with PTSD and Williamson claims that he trained Gracie to perform commands for the benefit of Williamson when he came to inherit her from her prior owner. However, there is also evidence raising questions about the timing and extent of Gracie's ability to do work or perform tasks for the direct benefit of Williamson as a disabled individual with PTSD at the time of his January 2019 hospitalization.  Answers to these questions turn on genuine questions of fact and credibility determinations that require resolution by a factfinder.  Neither party is thus entitled to summary judgment on the issue of whether Gracie qualifies as a service animal.  Thus, I recommend that Plaintiff's Motion for Partial Summary Judgment be **DENIED**.

### III.    CCIRH's Motion for Summary Judgment – DE 68

In its motion for summary judgment, CCIRH seeks full summary judgment on all counts and argues that all of Williamson's claims fail because the undisputed evidence shows as a matter of law that (1) CCIRH did not have a discriminatory policy or practice in place during Williamson's January 2019 treatment; (2) Williamson never triggered any non-discriminatory policy or otherwise requested an accommodation from CCIRH; (3) Williamson was not denied any services or accommodations; (4) Gracie did not qualify as a service animal during

Williamson's January 2019 treatment; and (5) Williamson fails to establish that he is entitled to any relief against CCIRH.  DE 68 at 4.

I will first briefly address CCIRH's fourth argument that Gracie did not qualify as a service animal since this argument is the inverse of what Williamson argued in moving for partial summary judgment.  For the reasons discussed above, there are genuine questions of disputed facts on this material issue.  Just as Williamson is unable to demonstrate that Gracie is a service animal as a matter of law, these disputed factual issues preclude CCIRH from establishing that Gracie is *not* a service animal as a matter of law.

As for CCIRH's remaining four arguments, I find each one to be without merit. Williamson brings his claims for disability discrimination under Title III of the ADA, Section 504 of the Rehabilitation Act, and Section 1557 of the ACA.  DE 1.  Each of these statutes – Title III of the ADA, the Rehabilitation Act, and the ACA – impose effectively identical requirements and, thus, courts typically consider claims brought under these statutes in tandem. *Badillo v. Thorpe*, 158 Fed. Appx. 208, 214 (11th Cir. 2005) (citing *Cash v. Smith*, 231 F.3d 1301, 1305 & n. 2 (11th Cir. 2000)); *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 830 (11th Cir. 2017) ("ADA and RA [Section 504] claims are governed by the same substantive standard of liability.").  42 U.S.C. § 18116(a) extends the standards of Section 504 to the ACA.

The ADA is divided into three sections.  Title III of the ADA, enacted on January 25, 1993, prohibits discrimination by private entities in places of public accommodation.  Specifically, the statute provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  In a private action under the ADA, a

court may provide "any person who is being subjected to discrimination on the basis of disability in violation of the Act injunctive relief, requiring a Defendant to make its facility readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12188(a)(2).  A plaintiff alleging Title III ADA discrimination must show that (1) he is a disabled individual; (2) the defendant owns, leases, or operates a place of public accommodation; and (3) the defendant discriminated against the plaintiff within the meaning of the ADA.  *Norkunas v. Seahorse NB, LLC*, 444 Fed. Appx. 412, 416 (11th Cir. 2011) (citing 42 U.S.C. § 12182(a)).

CCIRH argues that Williamson has failed to establish that CCIRH had a discriminatory policy or practice in place, which CCIRH contends is fatal to Williamson's disability discrimination claims.  DE 68 at 10.  In making this argument, CCIRH relies upon its written service animal policy in effect at the time of Williamson's 2019 hospitalization.  *See* DE 126-3 (Indian River Medical Center "Service Animals" Policy Approved July 5, 2017).  This argument is misplaced.  Williamson does not dispute the existence of this written policy.  Rather, the parties' dispute centers on whether CCIRH discriminated against Williamson on the basis of a disability by not providing a reasonable service animal accommodation as required by law.  Toward this end, Williamson must show that CCIRH discriminated against him by refusing to allow the presence of Gracie in CCIRH facilities as an accommodation of Williamson's existing PTSD disability.  *See* 28 C.F.R. § 36.302(c)(7).  While the parties' differing arguments about the contours and implications of CCIRH's written policy certainly bear on this analysis, the existence of the policy alone is not dispositive of this issue.

CCIRH argues next that Williamson fails to set forth any evidence that "either he or anyone on his behalf ever" made any request to any CCIRH employee or authorized representative for Gracie to accompany or visit Williamson during his January 2019 treatment so as to "trigger"

CCIRH's policy.  DE 68 at 11-12.  CCIRH contends that the testimony by Williamson and others on this point is directly refuted by other record evidence and is also lacking in specific identifying information.  Upon review, I cannot agree.  Williamson relies upon his own testimony as well as the testimony of six other individuals about repeated requests made to CCIRH staff for Gracie to accompany and visit Williamson during his January 2019 treatment at CCIRH.

Williamson testified under oath that before leaving his home to be taken to the Emergency Department at CCIRH, he specifically asked responding law enforcement officers for Gracie to accompany him and was told no but agreed to go with the understanding that Gracie would be able to come and be with him within the next few days.  DE 126-18 at 106:1-25 ("I want to take my service dog … if we are going to do this peacefully and we are going to go, all I ask is a little humanity and compassion and let me take Gracie with. … if I don't get my dog tonight, maybe it will be tomorrow or the next day? And they absolutely all agreed.").  Williamson further testified that he asked his evaluating doctor at the hospital if Gracie could accompany him as his service dog and was told that it was after hours but that he would do his best to ensure that his dog could accompany him if possible.  *Id.* at 111:25-112:15.  Throughout his testimony, Williamson fervently maintains that while being treated at the BHC, he made repeated requests to his doctors—including his psychiatrist and other hospital staff—for Gracie to accompany him at the BHC as his service animal; all to no avail.  *Id.* at 111:21-112:15, 128:4-21, 148:3-10, 169:16-25, 204:7-205:10, 221:9-222:9; 224:12-225:5; 249:11-251:1.

Former Indian River County Sheriff's Office Deputy Lacy Thomas Whittington—one of two law enforcement officers who responded to Williamson's home the night he was taken to the hospital—consistently testified that Williamson specifically asked Deputy Whittington "if his service dog could accompany him" to the hospital.  DE 77-9 at 36:4-24.  According to Deputy

Whittington, Gracie could have been transported along with Williamson in a patrol vehicle but hospital staff told her that Williamson "was unable to have the service dog with him during his stay in the BHC" and she was told by someone at the hospital that "since he can't have [Gracie] at the BHC, he was unable to have the dog with him" in the Emergency Department. *Id.* at 38:2-10, 41:25-42:4, 60:23-61:7. Another responding officer, Detective Robert Ryan, testified that on the night Williamson was transported to the hospital, Williamson also asked Detective Ryan for Gracie to accompany him to the hospital but that Deputy Whittington had checked with the hospital and was told no. DE 77-8 at 67:7-10, 69:1-70:2, 74:4-10.

Williamson's roommate at the BHC, Christopher Stewart, testified that although he never overheard any requests directly made to CCIRH staff due to separation for patient privacy, Williamson repeatedly told Stewart daily that he was asking for Gracie to be with him and to be transferred to the VA hospital, but that his requests were being denied. DE 77-10 at 13:19-14:2, 17:5-12.

Williamson's friend, Bruce Cady, visited Williamson four times—on January 18, 19, 20 and 22—and testified to consistently asking CCIRH staff for Gracie to accompany and visit Williamson at the BHC. DE 66-7 at 77:6-21, 83:17-84:9, 88:6-93:21, 95:18-96:11, 117:20-25, 122:21-123:2, 126:14-127:16, 132:20-133:7. During one visit on January 18, 2019, Mr. Cady says that after he asked a female receptionist if Gracie could visit, the receptionist called someone and then told Mr. Cady that Gracie could not enter the BHC. *Id.* at 77:15-21, 81:3-11. Mr. Cady then spoke with a female, middle aged, Caucasian, nurse wearing a medical jacket at the nurse's station to ask if Williamson's "VA-prescribed service dog as part of PTSD" could come to stay with Williamson and the nurse responded "No, the service dog is not allowed here. No the dog cannot come in to visit." Id. at 83:20-84:9, 85:4-18. The next day, January 19, 2019, Mr. Cady says he

asked a different female receptionist who said she wasn't sure if Gracie could visit.  *Id.* at 96:5-15, 99:20-100:5.  Mr. Cady then proceeded to the same nurse's station as the day before and spoke to a male, professionally dressed, Caucasian, late fifties/early sixties, wearing a medical coat about Gracie coming for a visit and was again told "no."  *Id.* at 100:20-101:7, 101:15-24.  The next day, January 20, 2019, Mr. Cady says he again spoke with another female nurse with red hair and freckles, wearing a medical coat, who indicated that she knew Williamson was trying to have his dog come in and suggested that Mr. Cady call administration to inquire.  *Id.* at 141:12-22, 142:22-24, 143:15-144:19.  Mr. Cady called administration the next day, January 21, 2019, spoke with an employee he believed to be named Jessica, again inquired about Gracie, and was told that the request would be elevated.  *Id.* at 147:1-8, 148:3-12, 149:23-25.  On January 22, 2019, a female manager—described by Mr. Cady as being possibly named Brenda, in low fifties, brunette, short hair, and with no medical jacket—explained that Gracie could visit but required documentation—including her training credentials.  *Id.* at 150:9-151:5.

Leah Cady—Mr. Cady's wife—testified to accompanying her husband to the BHC during one of his visits and says she brought Gracie into the BHC lobby to visit with Williamson but was told by her husband who was up at the counter that Gracie was not allowed in.  DE 133-1; DE 77-6 at 50:1-51:24.

Williamson's cousin, Samantha Obbagy, also visited Williamson at the BHC.  Upon hearing from Williamson that his requests for Gracie were being denied, Ms. Obbagy testified to asking a staff member—she believed it was a floor nurse—if Gracie could be with Williamson and if he could be transferred to the VA but the requests were denied.  DE 66-8 at 45:15-47:4.  Ms. Obbagy couldn't recall the exact wording but it related to not allowing service dog or dogs of any kind, patients may have allergies, and/or the dog would be disruptive.  *Id.*

Contrary to CCIRH's position and considering the record in the light most favorable to Williamson—including the above outlined testimony by Williamson and others, I find that there is sufficient evidence to establish genuine issues of material fact regarding requests made either by Williamson directly or others on his behalf to CCIRH representatives for CCIRH to accommodate Williamson's PTSD disability by allowing Gracie to visit with him as his service animal.  Sufficient identifying information has been provided from which a factfinder could determine whether such requests were indeed made.  CCIRH argues, among other things, that the medical records from Williamson's visit do not document anything about Gracie or requests being made.  But CCIRH's arguments all raise precisely the sort of inconsistencies and other credibility issues that fall squarely within the province of a jury at a trial, not the Court on a motion for summary judgment.  *See Liberty Lobby,* 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *Lane v. Celotex Corp.,* 782 F.2d 1526, 1528 (11th Cir. 1986) ("[T]he district court must not resolve factual disputes by weighing conflicting evidence, since it is the province of the jury to assess the probative value of the evidence.")

Next, CCIRH argues that Williamson has not set forth evidence that he was denied services and the "undisputed record evidence reflects that not only was [Williamson] admitted and treated at CCIRH, but his condition dramatically improved" while there.  DE 68 at 13.  However, the fact that Williamson's condition may have improved does not prevent him from  bringing a claim for disability discrimination under the ADA.  Williamson is not required to prove that CCIRH's failure to accommodate his requests for Gracie as his service animal resulted in ineffective treatment or adverse medical consequences.  Rather, what is required is a showing that Williamson experienced disability-based discrimination under the ADA during the time he was being treated at CCIRH as

a place of public accommodation.  As discussed above, Williamson has presented sufficient evidence upon which a jury could reasonably find in his favor.

Lastly, CCIRH argues that Williamson fails to establish that he is entitled to any relief against CCIRH.  I disagree.  The plain language of the ADA confers on Williamson a legal right to be free from discrimination on the basis of his disability with respect to "the full and equal enjoyment of the … facilities" of CCIRH.  *See* 42 U.S.C. § 12182(a).  Williamson asserts discrimination in the form of an offending practice and policy by CCIRH that denies access to and fails to accommodate service dogs belonging to disabled patients like him while being treated at CCIRH.  42 U.S.C. § 12188, entitled "Enforcement," provides for the remedies set forth in 42 U.S.C. § 2000a–3(a) "to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter [Title III of the ADA]."  42 U.S.C. § 12188(a)(1). In turn, the remedies in 42 U.S.C. § 2000a–3(a) include "a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order."  These remedies allow only injunctive relief (as opposed to money damages).  *See Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1329 (11th Cir. 2013) (noting that injunctive relief is the only form of relief available to plaintiffs suing under Title III of the ADA) (citing 42 U.S.C. § 12188(a) and 42 U.S.C. § 2000a–3(a)); *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968). Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party shows "a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury."  *Houston*, 733 F.3d at 1328–29 (11th Cir. 2013) (citations omitted).

Here, Williamson seeks declaratory and injunctive relief, compensatory damages, emotional distress damages, and attorneys' fees and costs.  Applying the above legal framework, I find that Williamson has satisfactorily set forth evidence to support his request for declaratory

and injunctive relief by showing a real immediate threat of ongoing harm. Williamson asserts that CCIRH's policy and practices governing service animals violates the ADA and it is undisputed that Williamson, an individual with a documented ongoing history of hospitalizations and treatment for PTSD-related symptoms, is likely to return to CCIRH for patient services in the future. In fact, there is record evidence showing that Williamson, a long-time resident of Vero Beach, has returned to CCIRH's Emergency Department for treatment two more times following his January 2019 treatment—once in December 2020 and again in February 2022. DE 66-5, DE 66-1 at 233:2-13, 227:15-23. Williamson has proffered enough evidence to show a real and immediate threat that CCIRH's service animal policy may again result in a Title III violation. Williamson has thus met the threshold for seeking declaratory and injunctive relief against CCIRH and CCIRH's contentions otherwise should be denied.

In addition, while CCIRH is correct that Williamson cannot recover compensatory damages under Title III of the ADA, *see Jairath v. Dyer*, 154 F.3d 1280, 1283 n. 7 (11th Cir. 1998) (finding that monetary damages are only available under Title III of the ADA if the action is initiated by the Attorney General), Williamson has also brought claims under Section 504 of the Rehabilitation Act. The Eleventh Circuit has held that "the Supreme Court has established beyond any doubt that victims of intentional discrimination may, under Title VI, and therefore under the [Rehabilitation Act], recover compensatory damages." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1191-1192 (11th Cir. 2007). *Sheely* involved a legally blind mother who sued a diagnostic imaging facility and alleged that her guide dog had been unlawfully denied access to the facility while she was there with her minor son. *Id.* at 1177-78. The district court granted final summary judgment on all counts in favor of the facility. *Id.* at 1182. The Eleventh Circuit partially reversed and held that the mother's claims for injunctive and declaratory relief under the ADA and

the Rehabilitation Act were not moot despite defendant's purported cessation of the allegedly wrongful conduct by implementing a new service animal policy. *Id.* at 1188-89. Additionally, as a matter of first impression in all the circuits, the Eleventh Circuit held that that non-economic compensatory damages, including for emotional distress, "are available to make whole the victims of violations of § 504 of the Rehabilitation Act. *Id.* at 1190, 1199, 1204 ("As a matter of both common sense and case law, emotional distress is a predictable, and thus foreseeable, consequence of discrimination. Certainly, federal courts have long found that violations of the [Rehabilitation Act] and other antidiscrimination statutes frequently and palpably result in emotional distress to the victims"). Thus, if Williamson prevails on his claims brought under the Rehabilitation Act, he may be entitled to the compensatory damages he seeks.

## <u>CONCLUSION</u>

Based on the foregoing, I respectfully recommend the following:

(1)  Plaintiff Williamson's Motion to Strike Anne Posey's Declaration, DE 80, should be **DENIED**;

(2)  Defendant CCIRH's Motion to Strike Portions of Three Affidavits, DE 104, should be **DENIED**;

(3)  Defendant's CCIRH's Motion to Exclude Proposed Expert, Michelle Dunlap, M.Ed. should be **GRANTED IN PART AND DENIED IN PART** insofar as I recommend that Ms. Dunlap be permitted to testify about her general knowledge of professional dog training for dogs servicing individuals with diagnosed PTSD; her personal virtual and in-person observations of Williamson and Gracie; and her opinion about how and why she believes Gracie exhibited the general behavioral characteristics of a service animal based on her own experience. I further

recommend, however, that Ms. Dunlap be precluded from testifying about anything tied to Williamson's hospitalization in January 2019, including whether Gracie should have been allowed in to the BHC and anything having to do with the ADA's legal scheme for service animals.

(4)     Plaintiff Williamson's Motion for Partial Summary Judgment, DE 64, should be **DENIED**; and

(5)     Defendant CCIRH's Motion for Summary Judgment, DE 68, should be **DENIED**.

## NOTICE OF RIGHT TO OBJECT

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with U.S. District Judge Jose E. Martinez.  Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).  **Conversely, if a party does not intend to object to this Report and Recommendation, then that party shall file a Notice of such within five (5) days of the date of this Report and Recommendation.**

**DONE AND RECOMMENDED** in Chambers at Fort Pierce, Florida, this 6th day of December, 2022.

_____
SHANIEK M. MAYNARD
U.S. MAGISTRATE JUDGE